IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JAYNA JAMES,                      §
                                  §
          Plaintiff,              §
                                  §
v.                                §        CIVIL ACTION NO. H-14-1650
                                  §
CAROLYN W. COLVIN,                §
ACTING COMMISSIONER OF THE        §
SOCIAL SECURITY ADMINISTRATION,   §
                                  §
          Defendant.              §

<u>**MEMORANDUM AND RECOMMENDATION**</u>

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 19) and Defendant's Cross-Motion for Summary Judgment (Doc. 16). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for supplemental security income under of the Social Security Act ("the Act").

## A.  **Medical History**

Plaintiff was born on July 30, 1968, and was forty-two years

---

[1]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  <u>See</u> Doc. 7.

old on the alleged disability onset date of December 17, 2010.[2]
Plaintiff earned a high school diploma and worked as an advertising
sales representative and an appointment clerk prior to December
2010.[3]  Plaintiff began receiving short-term disability benefits in
July 2010 when she stopped working due to osteoarthritis and
fibromyalgia and continued to receive those benefits through July
2011.[4]  Plaintiff worked part time from July 2010 until December
2010, when she stopped working entirely for the same reason that
she had quit her full-time job.[5]  In July 2011, Plaintiff began
receiving long-term disability benefits.[6]

Prior to the alleged disability onset, Plaintiff had been
diagnosed with and treated for migraine headaches.[7]  On June 28,
2010, a magnetic resonance imaging scan ("MRI") of Plaintiff's
brain revealed mild ethmoid sinus disease and cerebellar tonsillar
ectopia without cervicomedullary kinking.[8]  In all other respects,
her brain appeared normal.[9]

Dhiman Basu, M.D., ("Dr. Basu") of North Hills Rheumatology,

---

[2]     See Tr. 25, 131, 139.

[3]     See Tr. 24, 25, 36, 37-39, 153, 161-64, 176-80, 376.

[4]     See Tr. 376.

[5]     See id.

[6]     See id.

[7]     See, e.g., Tr. 218, 245-52, 270, 290.

[8]     See Tr. 290.

[9]     See id.

initially saw Plaintiff in May 2010, seven months prior to the
alleged onset of disability, for evaluation of joint pain.[10]
Plaintiff stated that the joint pain began two months prior to the
appointment and was located in both feet, both knees, both
shoulders, and her neck.[11] She told Dr. Basu about a motor vehicle
accident that occurred ten years prior in which Plaintiff sustained
trauma to the neck.[12] Since then, Plaintiff attested, "she had
experienced tingling and numbness in her hands off and on."[13] She
described the pain as severe, progressive, and periodic throughout
the day.[14] Dr. Basu ordered diagnostic tests and x-rays and
adjusted Plaintiff's medication.[15]

A month later, Plaintiff returned to see Dr. Basu for a
follow-up evaluation.[16] Dr. Basu's notes for that visit stated that
the evaluation was of "joint and muscle pain in the context of
fibromyalgia," a condition that, according to his note, had existed
for three years.[17] Dr. Basu monitored and adjusted Plaintiff's
medication at that time and at monthly appointments throughout

---

[10]    See Tr. 360-64.

[11]    See Tr. 360.

[12]    See id.

[13]    Id.

[14]    See id.

[15]    See Tr. 361.

[16]    See Tr. 355-59.

[17]    Tr. 355.

2010.[18]  Dr. Basu also ordered laboratory tests and x-rays as he
deemed necessary during the monthly appointments.[19]  At the November
appointment, Plaintiff reported that the pain was slightly better.[20]

In August 2010, Plaintiff presented at the Baylor Medical
Center Emergency Room in Grapevine ("Baylor ER"), complaining of
chest pain, anxiety, and tingling in her hands and face.[21]
Plaintiff reported a past medical history of fibromyalgia, migraine
headaches, and depression.[22]  Results of a chest x-ray were within
normal limits.[23]  The treatment notes reflected that medication
alleviated the tingling in her arms and feet and made it easier for
her to breathe, but the pain continued in her shoulders and arms.[24]
Plaintiff was discharged and instructed to follow up with her
primary care physician.[25]

A few days later, she was seen at Keller Family Medical Center
in Keller, Texas.[26]  She reported that Xanax helped with anxiety and
chest tightness, which waxed and waned, but she was experiencing

---

[18]    See Tr. 325-54, 358.

[19]    See Tr. 325-54.

[20]    See Tr. 330.

[21]    See Tr. 231, 233, 244.

[22]    See Tr. 244.

[23]    See Tr. 243.

[24]    See Tr. 232.

[25]    See Tr. 232.

[26]    See Tr. 270.

4

nausea secondary to "pain all over" all the time and was getting tired just walking around the house.[27]  The diagnosis given included fibromyalgia, chest pain, and anxiety.[28]  The doctor's plan included a cardiology evaluation for chest pain and to return in two weeks.[29]

Plaintiff presented at Keller Family Medical Center several times in September, October, and December for minor illnesses and routine care.[30]  In November 2010, Plaintiff returned to Keller Family Medical Center following a visit the night before to an emergency room ("ER") for lower back pain.[31]  Plaintiff's entire thoracic and lumbar area was tender to palpation with mild right costovertebral angle tenderness, and her range of motion was limited as a result of the pain.[32]  Amanda Wickson, PA-C, ("PA Wickson") recommended rest.[33]

On December 16, 2010, Plaintiff was seen at the Baylor ER for treatment of an injury to her right shoulder and ribs following an all-terrain vehicle ("ATV") accident.[34]  Radiographs of her spine allowed limited evaluation of C7 but showed no significant

---

[27]  See Tr. 271.

[28]  See id.

[29]  See id.

[30]  See Tr. 272-73.

[31]  See Tr. 274.

[32]  See id.

[33]  See id.

[34]  See Tr. 225.

radiographic abnormality.[35]  Radiographs of the chest and right ribs revealed no displaced right rib fractures and no significant radiographic abnormality of the chest.[36]  Radiographs of the right shoulder indicated acromioclavicular ("AC") joint dislocation.[37]

Plaintiff presented to Keller Family Medical Center on December 21, 2010, in severe pain from the shoulder injury.[38] Plaintiff reported that her hands were going numb and speculated that she had nerve damage.[39]  She sought a referral for an orthopedic surgeon who could perform shoulder surgery sooner than was scheduled, and she was told to "[g]o to Harris ER" where she could be evaluated by Gurpreet Bajaj, M.D., ("Dr. Bajaj"), of Orthopedic Specialty Associates, with the possibility of surgery later that week.[40]

Plaintiff was admitted to the hospital on December 21, 2010, and Dr. Bajaj surgically repaired the AC ligament in Plaintiff's right shoulder on December 23, 2010.[41]  He noted that Plaintiff tolerated the procedure well.[42]  However, Plaintiff said that, after

---

[35]   See Tr. 227.

[36]   See Tr. 228.

[37]   See Tr. 229.

[38]   See Tr. 275.

[39]   See id.

[40]   See id.

[41]   See Tr. 319, 444.

[42]   See Tr. 445.

surgery, she lost feeling in her entire right upper extremity on an intermittent basis.[43]

Plaintiff returned to Dr. Basu on December 30, 2010, for a follow-up appointment for joint and muscle pain associated with fibromyalgia.[44] Plaintiff rated her pain as moderate but told Dr. Basu that the pain in her feet, knees, left shoulder, and neck were slightly better, that is, in all locations except her surgically repaired right shoulder.[45]

Dr. Basu's musculoskeletal examination revealed normal arm swing with normal heel-toe and tandem walking, normal muscle tone, tenderness to palpation on the chest wall and on the costochondral junction where the ribs attach to the sternum.[46] He also noted that Plaintiff's muscle strength was 5/5 for all groups tested, that her cervical range of motion indicated decreased flexion and extension without pain.[47] The range of motion in Plaintiff's non-injured shoulder indicated improving abduction and external rotation without pain.[48] The range of motion of her injured shoulder indicated decreased abduction and external rotation without pain,

---

[43]    See Tr. 319, 325.

[44]    See Tr. 325.

[45]    See id.

[46]    See Tr. 327.

[47]    See id.

[48]    See id.

which was worse after the recent trauma.[49]

Under the heading of "Impression," Dr. Basu listed:

1.   Displacement of cervical intervertebral disc w/o myelopathy.
2.   Degeneration of cervical intervertebral disc.
3.   Vitamin D insufficiency
4.   Osteoarthrosis, localized, not specified whether primary or secondary, involving shoulder region. Osteoarthrosis, localized, not specified whether primary or secondary, involving lower leg. Osteoarthrosis, localized, not specified whether primary or secondary, involving ankle and foot.
5.   Other tensynovitis of hand and wrist. Tenosynovitis of foot and ankle.
6.   Myalgia and myosytis, unspecified- Clinically worse. Chronic fatigue syndrome. Chronic pain syndrome.
7.   Unspecified idiopathic peripheral neuropathy.
8.   Cervical radiculitis.[50]

Shortly after the December surgery on her right shoulder, Plaintiff fell and re-ruptured the repair, which required a second surgery.[51] She underwent shoulder surgery again on January 4, 2011, and tolerated the procedure well.[52]

Plaintiff presented at Keller Family Medical Center on January 17, 2011, complaining of severe depression, inability to sleep, and constipation.[53] Plaintiff identified marital problems and recent surgeries as stressors.[54] Plaintiff said that she was tearful

---

[49]    See id.

[50]    Tr. 328.

[51]    See Tr. 304, 319, 452.

[52]    See Tr. 319, 446, 452.

[53]    See Tr. 259.

[54]    See id.

8

regularly, was worried about everything, was overwhelmed, was fatigued, and felt hopeless.[55]   Wickson diagnosed Plaintiff with depressive disorder, prescribed medication, and referred Plaintiff for counseling.[56]

In early February 2011, Plaintiff reinjured her right shoulder while closing a car door, which resulted in severe pain with recurrent dislocation.[57]  On February 8, 2011, Plaintiff underwent surgery a third time.[58]  Dr. Bajaj inserted a plate and connected it to the AC joint with six locking screws into the acromion and three cortical screws into the clavicle.[59]  Plaintiff tolerated the procedure well, according to Dr. Bajaj.[60]

On April 1, 2011, Keith C. Watson, M.D., ("Dr. Watson"), also with the Orthopedic Specialty Associates saw Plaintiff for continuing severe pain in her shoulder.[61] His examination indicated that Plaintiff was extremely tender over the AC joint, but, he noted, she appeared to be hypersensitive.[62]  Dr. Watson injected Plaintiff with a corticosteroid hormone and Lidocaine, but

---

[55]   See id.

[56]   See Tr. 259-60.

[57]   See Tr. 454.

[58]   See Tr. 319, 463-64.

[59]   See Tr. 464.

[60]   See id.

[61]   See Tr. 304.

[62]   See id.

Plaintiff reported no relief.[63]  Although the source of the pain was unclear to Dr. Watson, he opined that "the fracture [wa]s healed and the irritation [wa]s quite likely at the AC joint and that removal of hardware and distal clavicle resection could be of benefit."[64]

On April 4, 2011, Dr. Watson performed the surgery without difficulty, but Plaintiff "continued to experience significant pain out of proportion to expected."[65]  Dr. Watson also recorded that Plaintiff "was very reticent to move and physical therapy had to be implemented to get the patient mobilized."[66]  During the nine-day hospitalization, Dr. Watson consulted internal medicine about Plaintiff's "issues with gastrointestinal mobility" and psychiatry "because of the overlapping concerns of depression."[67]  Plaintiff was discharged in stable condition with medication for pain and was instructed to follow up as an outpatient.[68]

Plaintiff saw Dr. Basu on April 15, 2011, and reported that the generalized joint and muscle pain in her feet, knees, shoulders, and neck was stable except for the pain in her surgically repaired shoulder and, to a lesser extent, in her

---

[63]     See id.

[64]     Tr. 305; see also Tr. 253.

[65]     See Tr. 253, 255.

[66]     Tr. 253.

[67]     Id.; see also Tr. 253.

[68]     See Tr. 254.

fingers.[69]  Dr. Basu noted that she rated the pain as moderate and that the symptoms were not progressive.[70]  Dr. Basu added "disorders of bursae and tendons of shoulder region" to the list of Plaintiff's conditions and ordered laboratory tests in advance of the next appointment to be scheduled in six weeks.[71]

The next orthopedic office note was for a postoperative follow-up appointment on April 29, 2011.[72]  Upon examination, Dr. Bajaj found that the wound looked very good.[73]  He showed Plaintiff how to do exercises and instructed her to engage in a guarded range of motion, to start discontinuing using a sling, and to return for another follow-up appointment in about one month.[74]

On May 20, 2011, Plaintiff returned to see Dr. Basu, who noted that the fibromyalgia was stable and that Plaintiff rated the pain as moderate.[75]  Dr. Basu ordered laboratory tests and x-rays and made medication adjustments.[76]

Plaintiff returned to Dr. Watson's office on May 24, 2011, and

---

[69]   See Tr. 319.

[70]   See id.

[71]   See Tr. 322.

[72]   See Tr. 301.

[73]   See id.

[74]   See id.

[75]   See Tr. 313.

[76]   See Tr. 317.

complained of acute pain in her right shoulder.[77]  She reported that she had picked up a light-weight box to waist height and had moved to her left when she felt the pain.[78]  The physician's assistant examined Plaintiff and wrote in his treatment note, "Musculoskeletal-wise, I see no obvious cause for discomfort."[79] Plaintiff was instructed to continue with a "gentle range of motion, progressing along."[80]

On June 21, 2011, Plaintiff saw Dr. Watson, who noted:

> She remains uncomfortable. Her incision is still pink and reactive.  She feels fullness on top.  It does not appear fluctuant, but appears to be fibrous.  Her discomfort is primarily over her incision and anterior deltoid. Functionally, she remains very limited for 10 weeks out.[81]

Dr. Watson recommended more home exercises and indicated that, if she was not feeling better in one month, he would consider formal physical therapy depending on her level of sensitivity.[82]

On July 1, 2011, Plaintiff saw Dr. Basu who added osteopenia of the left femoral neck to the list of Plaintiff's conditions.[83] Dr. Basu injected Supartz, for inflammation and pain, into

---

[77]  See Tr. 302.

[78]  See id.

[79]  Id.

[80]  Id.

[81]  Tr. 300.

[82]  See id.

[83]  See Tr. 307, 310-11.

Plaintiff's left knee joint.[84]  He instructed Plaintiff to return in one week for a second dose of the left-knee viscosupplementation and her "last appointment" with him.[85]  Plaintiff returned on August 29, 2011; November 4, 11, and 18, 2011; and December 15, 2011, for medication management and left knee injections.[86]  On November 18, 2011, Dr. Basu released Plaintiff to work on a part-time basis.[87]

On September 23, 2011, Ashley Noble, Psy.D., ("Dr. Noble") conducted a Clinical Interview with Mental Status Examination of Plaintiff.[88]  Plaintiff provided Dr. Noble with a personal history and appeared to Dr. Noble to be a reliable historian but "was reluctant to provide information . . . at times."[89]  Plaintiff identified her chief complaints as depression, memory impairment, and various health problems.[90]

Describing her experience of depression, Plaintiff stated that she had experienced it intermittently since she was a teenager, and the recent episode was causing tearfulness, insomnia, diminished interest in activities she had once enjoyed, as well as a depressed

---

[84]    See Tr. 311.

[85]    See id.

[86]    See Tr. 408-30.

[87]    See Tr. 411.

[88]    See Tr. 374-80.

[89]    Tr. 374.

[90]    See id.

mood.[91]   She rated the current episode as a nine on a ten-point scale.   Plaintiff reported two prior suicide attempts, both more than ten years prior to the evaluation.[92]

Regarding memory impairment, which Plaintiff dated back to December 2010 after surgery, Plaintiff said that she has to set an alarm for important events.[93]   On the same ten-point scale used to rate the depression, Plaintiff rated the memory loss as a five.

Plaintiff told Dr. Noble that she first noticed the symptoms of fibromyalgia and osteoarthritis in February 2010.[94]   She shared information about her shoulder injury and said that she had undergone five surgeries on the injured shoulder.[95]

Plaintiff described a typical day as involving watching television and completing various chores around her apartment.[96] She also said that she assisted her son, who had been in a car accident recently, with tasks such as taking medication.[97] Plaintiff stated that she was capable of dressing and feeding herself and managing finances.[98]   Occasionally, though, Plaintiff

---

[91]     See id.

[92]     See Tr. 375.

[93]     See Tr. 374-75.

[94]     See Tr. 375.

[95]     See id.

[96]     See id.

[97]     See id.

[98]     See id.

reported, she has had difficulty concentrating when paying bills.[99]

Dr. Noble noted that Plaintiff was able to complete all hygiene tasks and household chores.[100]  Plaintiff drove herself to the appointment, arriving on time.[101]  She reported that she typically drove to Walmart, the grocery store, and drive-through restaurants.[102]

Regarding her social circle, Plaintiff explained that she had two sons, with whom she had good relationships, and a husband, from whom she was separated.[103]  Plaintiff said she did not have a wide circle of friends and primarily spent time with her family and friends who visited from Houston.[104]

Dr. Noble conducted a mental status exam.[105]  In her opinion, Plaintiff exhibited no evidence of behavioral abnormalities, a thought disorder, current suicidal or homicidal ideation, or hallucinations.[106]  Plaintiff appeared, in Dr. Noble's view, to be of average intelligence with rational, goal-oriented, and easy-to-

---

[99]    See id.

[100]   See Tr. 376.

[101]   See id.

[102]   See id.

[103]   See Tr. 375.

[104]   See Tr. 376.

[105]   See Tr. 377-78.

[106]   See Tr. 377.

follow thought content.[107]  Dr. Noble found Plaintiff's insight to be fair and her judgment to be intact.[108]  Although Plaintiff described her mood as depressed, she exhibited a broad range of affect throughout the evaluation, according to Dr. Noble's notes.[109] Plaintiff successfully completed at least two of the memory and concentration tasks, partially completed others, and refused to attempt one.[110]  About the memory and concentration tasks, Dr. Noble wrote, "It should be noted that [Plaintiff] did not appear to put forth much effort on any of the items that involved memory."[111]  Dr. Noble was unsure whether the lack of effort was deliberate or a function of a lack of confidence.[112]

Dr. Noble diagnosed Plaintiff with depressive disorder not otherwise specified and Cluster B personality traits and assessed Plaintiff's Global Assessment of Functioning ("GAF") at sixty out of one hundred, a score at the high end of the category for moderate symptoms or moderate difficulty in social, occupational, or school functioning.[113]  Dr. Noble found Plaintiff's prognosis to

---

[107]    See id.

[108]    See Tr. 378.

[109]    See Tr. 377.

[110]    See Tr. 377-78.

[111]    Tr. 378.

[112]    See id.

[113]    See Tr. 378; Diagnostic & Statistical Manual of Mental Disorders 32 (Am. Psychiatric Ass'n 4th ed. 2000)(replaced in 2013 by the fifth edition, which dropped GAF in favor of the World Health Organization Disability Assessment

be guarded, noting the extent of her history of depression, health problems, unemployment, relationship problems, and previous cocaine use.[114]  The doctor stated that Plaintiff's mental health problems did not appear to interfere with the ability to work as exemplified by her ability to complete tasks at home and take care of her son.[115]

In November 2011, PA Wickson saw Plaintiff at the Keller Family Medical Center[116] for numbness in her right arm and hand, chest pain on the right side, lack of energy, and shortness of breath.[117]  PA Wickson ordered an echocardiogram ("EKG") that was performed in the office.[118]  The results were normal.[119]  PA Wickson referred Plaintiff for a cardiology workup.[120]

In December 2011, Plaintiff saw Joseph W. Burke, M.D., ("Dr. Burke") for a cardiology consultation and evaluation of an EKG, shortness of breath, and chronic obstructive pulmonary disease

---

Schedule 2.0).

[114]    See Tr. 379.

[115]    See id.

[116]    Plaintiff was seen at Keller Family Medical Center on multiple occasions from May 2011 to March 2012 for minor illnesses, hormone therapy, and blood tests.  See Tr. 491-98, 501, 502.

[117]    See Tr. 499.

[118]    See id.

[119]    See id.

[120]    See id.

("COPD").[121]   Dr. Burke ordered additional diagnostic testing and discussed lifestyle changes with Plaintiff.[122]

On January 3, 2012, Plaintiff saw Larry Kjeldgaard, D.O., ("Dr. Kjeldgaard") of Trinity Orthopedics, complaining of constant dull pain in the cervical spine region.[123]   Dr. Kjeldgaard reviewed Plaintiff's MRI films of the cervical spine region that had been taken in early December 2011.[124]   He found no evidence of disc herniation, nerve root compression, or surgical pathology.[125]   He opined that the cervical spine was not the cause of her sensory complaints.[126]

Plaintiff followed up with Dr. Basu for medication management on March 1, 2012, at which time Dr. Basu referred Plaintiff to a pain-management specialist as soon as possible related to degenerative disc disease of the spine with radicular symptoms and with the bulging disc that was worst at C6/C7.[127]   She saw Dr. Basu again on June 12, 2012, for medication management.[128]   His notes repeated the referral for pain management, leaving it unclear

---

[121]   See Tr. 481.

[122]   See Tr. 485.

[123]   See Tr. 487.

[124]   See Tr. 489, 527.

[125]   See Tr. 489.

[126]   See id.

[127]   See Tr. 520-21.

[128]   See Tr. 523-24.

18

whether she had yet complied with his first referral.[129]  He also recommended that she see Dr. Burke "for punch biopsy of one of those lesions."[130]

At the August 2012 medication-management appointment, Dr. Basu noted that Plaintiff's gait-and-station examination revealed "normal arm swing, with normal heel-toe and tandem walking."[131] Plaintiff's muscle strength was found to be 5/5 for all groups tested, and her muscle tone was normal.[132]  Dr. Basu noted mild improvement in the tenderness at the chest wall and costochondral junction.[133]  In Dr. Basu's treatment plan, he again mentioned the referral for pain management and recommended that Plaintiff see Dr. Burke for "control of depression."[134]

**B.**  **Application to Social Security Administration**

Plaintiff protectively applied for disability insurance benefits on June 8, 2011, claiming an inability to work since December 17, 2010,[135] due to fibromyalgia, arthritis, and shoulder

---

[129]    See Tr. 524.

[130]    See Tr. 524.  Dr. Basu's note did not further describe or discuss "those lesions."  See Tr. 523-24.

[131]    Tr. 531.

[132]    See id.

[133]    See id.

[134]    See Tr. 534.

[135]    Plaintiff corrected the date of onset stated on the initial application from April 15, 2010, to December 17, 2010.  See Tr. 131, 133.

injuries.[136]  On a disability report dated July 8, 2011, Plaintiff also claimed systemic lupus erythematosus, peripheral neuropathy, cervical radiculopathy, migraine headaches, anxiety, and depression as other conditions that limited her ability to work.[137]

On October 9, 2012, Dr. Basu completed a Fibromyalgia Medical Source Statement.[138]  Therein, he stated that Plaintiff's condition met the American College of Rheumatology criteria for fibromyalgia and listed degenerative disease of cervical spine with radiculitis as the only other diagnosed impairment.[139]  Dr. Basu asserted that Plaintiff's prognosis was "unpredictable."[140]  Dr. Basu did not identify any clinical findings supporting the diagnosis of fibromyalgia but referred to the MRI of the cervical spine that he said showed degenerative disc disease of the spine.[141]  He listed the following as Plaintiff's symptoms: multiple tender points, subjective swelling, numbness and tingling, and chronic fatigue syndrome.[142]  Dr. Basu opined that emotional factors contributed to Plaintiff's symptoms and functional limitations and that Plaintiff's pain, which was present in the cervical spine,

---

[136]  See Tr. 13, 131, 133, 136, 139.

[137]  See Tr. 152.

[138]  See Tr. 536-42.

[139]  See Tr. 536.

[140]  Id.

[141]  See id.

[142]  See id.

bilaterally in the shoulders, arms, hands, fingers, legs, and knee, and in the right ankle.[143]

In Dr. Basu's opinion, Plaintiff could walk one to two city blocks without rest or severe pain, could sit and stand/walk less than two hours each in an eight-hour work day, needed to shift positions at will and to walk for fifteen minutes every hour.[144] Regarding the amount of time Plaintiff could sit at one time, Dr. Basu circled both thirty minutes and one to two hours for sitting and both twenty minutes and one to two hours for standing.[145]  Dr. Basu opined that Plaintiff would need to take unscheduled breaks during the workday but could not predict how often or for how long.[146]

Dr. Basu assessed Plaintiff's physical abilities, stating that Plaintiff could occasionally lift up to ten pounds, rarely lift over ten up to twenty pounds; rarely twist, stoop, crouch, squat, climb ladders, and climb stairs; occasionally flex neck downward, turn head right or left, look up, hold head in static position.[147] In an eight-hour workday, Dr. Basu opined, Plaintiff could use her right arm, hands, and fingers no more than twenty percent of the

---

[143]    See Tr. 536-37.

[144]    See Tr. 537-38.

[145]    See Tr. 537.

[146]    See Tr. 538.

[147]    See id.

time and, on her left side, could use her hands and reach overhead fifty percent of the time and use her fingers and reach in front of her body sixty percent of the time.[148]  Regarding her mental health, Dr Basu opined that Plaintiff would be off task twenty-five percent of the time, would have good days and bad days, and would miss more than four days of work per month.[149]

Dr. Basu also completed a Manipulative Limitations Medical Source Statement on October 9, 2011, in which he identified, tenderness, pain, paresthesia, and reduced grip strength as symptoms that affected Plaintiff's shoulders, elbows, wrists, hands, or fingers.[150]  He noted on a diagram that Plaintiff experienced frequent pain in the index and middle fingers of each hand and in both wrists.[151]

On October 11, 2011, Charles Lankford, Ph.D., ("Dr. Lankford") completed a Psychiatric Review Technique and a Mental Residual Functional Capacity ("RFC") Assessment.[152]  Based on Plaintiff's medical record, Dr. Lankford assessed whether Plaintiff's psychiatric disposition met or equaled any of the disorders

---

[148]    See Tr. 539.

[149]    See id.

[150]    See Tr. 541.

[151]    See id.

[152]    See Tr. 381-98.

described in the listings of the regulations[153] (the "Listings").[154]

In particular, he considered Listing 12.04 (affective disorders).[155]  Dr. Lankford found that Plaintiff's condition was medically determinable but did not precisely satisfy the diagnostic criteria of Paragraph A of Listing 12.04.[156]  Regarding the functional limitations described in Paragraph B, Dr. Lankford found that Plaintiff experienced mild restriction in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.[157]  He found no medical evidence of episodes of decompensation of extended duration.[158]  He further opined that the evidence did not establish the presence of any criteria in Paragraph C of Listing 12.04.  Dr. Lankford concluded that Plaintiff's limitations were partially supported by the record evidence but were not severe enough to meet Listing 12.04.[159]

In his Mental RFC Assessment, Dr. Lankford evaluated Plaintiff as moderately limited in the following categories: (1) "[t]the ability to remember locations and work-like procedures; (2) "[t]he

---

[153]    20 C.F.R. Pt. 404, Subpt. P, App. 1.

[154]    See Tr. 381-94.

[155]    See Tr. 381, 384.

[156]    See Tr. 384.

[157]    See Tr. 391.

[158]    See id.

[159]    See Tr. 393.

ability to understand and remember detailed instructions;" (3)
"[t]he ability to carry out detailed instructions;" (4) "[t]he
ability to maintain attention and concentration for extended
periods;" and (5) [t]he ability to complete a normal workday and
workweek without interruptions from psychologically based symptoms
and to perform at a consistent pace without an unreasonable number
and length of rest periods."[160] Regarding all of the other fifteen
abilities considered under the broad categories of understanding
and memory, sustained concentration and persistence, social
interaction, and adaptation, Dr. Lankford rated Plaintiff as not
significantly limited.[161]

He concluded that Plaintiff could "understand, remember, and
carry out detailed but not complex instructions, make decisions,
attend and concentrate for extended periods, accept instructions,
and respond appropriately to changes in routine work settings."[162]
On December 23, 2011, Richard Campa, Ph.D, ("Dr. Campa") affirmed
Dr. Lankford's mental RFC assessment.[163]

On October 21, 2011, Plaintiff completed a function report in
which she claimed that her conditions limited her ability to work
because she experienced joint pain in the "fingers [and] knee

---

[160]   Tr. 395-96.

[161]   See id.

[162]   Tr. 397.

[163]   See Tr. 433.

[sic], fatigue, migraines from fl[uo]re[s]cent lighting, memory loss," and anxiety.[164]  She also claimed that she was unable to sit for more than a few hours at a time.[165]  Plaintiff described a typical day as involving taking medication, showering, eating, transporting her son to and from school, napping, and completing daily chores with the help of her son.[166]  She reported trouble sleeping due to severe pain that prevented her from getting comfortable.[167]  The only personal care item with which she indicated experiencing difficulty was dressing.[168]  She said that, when she lost feeling in her right hand, she was unable to secure buttons.[169]

In the report, Plaintiff indicated that she used an alarm to remind her when to take medicine and that she prepared frozen meals for herself but was no longer able to cook meals as she had prepared daily in the past.[170]  She said that she cleaned and washed laundry with the help of her son but that it took her "several hours over several days."[171]  Plaintiff reported going outside a

---

[164]    Tr. 168.

[165]    See id.

[166]    See Tr. 169.

[167]    See id.

[168]    See id.

[169]    See id.

[170]    See Tr. 170.

[171]    Id.

"few days a week" and traveling in a car as either the driver or a passenger.[172]  She said that she was able to go out alone, shop in stores for food, toiletries, and household items, pay bills count change, manage a savings account, and use a checkbook or money orders.[173]

Before her ATV accident and the rise of other conditions, Plaintiff enjoyed horseback riding, ATV riding, bike riding, jogging, and engaging in watersports.[174]  Her current social activities consisted of talking on the telephone or visiting with others in person at her home on a weekly basis and going to doctor appointments.[175]  Plaintiff said she was no longer as social as she used to be because of chronic pain.[176]

The list of activities that Plaintiff said were affected by her conditions included lifting, squatting, bending, standing reaching, walking, sitting, kneeling, hearing, stair climbing, seeing, remembering, completing tasks, concentrating, following instructions, and using her hands.[177]  In explanation of how her conditions affected the preceding activities, Plaintiff stated that she could not lift more than ten pounds, her abilities to hear and

---

[172]    Id.

[173]    See Tr. 171.

[174]    See Tr. 169, 172.

[175]    See Tr. 172.

[176]    See Tr. 173.

[177]    See id.

to see had declined, she experienced chest pain from walking and stair climbing, and joint pain prevented other activities.[178] Plaintiff reported being capable of walking twenty-five yards before having to stop and rest and needing ten to twenty minutes of rest before continuing.[179]   Plaintiff indicated that she wore an unprescribed knee brace daily.[180]

Plaintiff stated that she could concentrate for twenty minutes, could follow written or spoken instructions, and could complete tasks but not in a timely fashion.[181] She was able to get along with authority figures, she said, but could not handle stress or changes in routine.[182]   The only medication side effect she reported was forgetfulness, which she connected to Xanax.[183]

In November 2011, Roberta Herman, M.D., ("Dr. Herman") completed a Physical RFC Assessment.[184]   Dr. Herman addressed Plaintiff's physical abilities, finding that she was capable of occasionally lifting or carrying up to twenty pounds, frequently lifting or carrying ten pounds, standing and/or walking for a total of about six hours in an eight-hour workday, sitting for a total of

---

[178]   See id.

[179]   See id.

[180]   See Tr. 174.

[181]   See Tr. 173.

[182]   See Tr. 174.

[183]   See Tr. 175.

[184]   See Tr. 399-406.

about six hours in an eight-hour workday, and was limited to
occasional pushing and/or pulling on her right side only.[185]
Additionally, Dr. Herman found Plaintiff limited in her ability to
reach in all directions.[186]  According to Dr. Herman, the record did
not establish any postural, visual, communicative, or environmental
limitations.[187]  Dr. Herman indicated that the record did include a
medical source statement regarding Plaintiff's physical capacity.[188]
Dr. Herman found that Plaintiff's alleged limitations were
partially supported by record evidence.[189]  On January 4, 2012, San-
San Yu, M.D., ("Dr. Yu") affirmed Dr. Herman's RFC assessment.[190]

     In December 2011, Plaintiff completed a disability report and
a function report in connection with the appeal of the initial
decision to deny benefits.[191]  She reported, in the disability
report, that her conditions had worsened in the prior five months,
specifically mentioning increases in knee pain from osteoarthritis
and frequency of numbness in her right hand and arm.[192]  She
explained that extreme fatigue, shortness of breath, and chronic

---

[185]   See Tr. 400.

[186]   See Tr. 402.

[187]   See Tr. 401-03.

[188]   See Tr. 405.

[189]   See Tr. 406.

[190]   See Tr. 435.

[191]   See Tr. 186-99.

[192]   See Tr. 186.

pain interfered with her ability to care for her personal needs but said that there was no change in her daily activities.[193]

In the function report, Plaintiff reported that chronic pain, anxiety, numbness in both arms and hands, shortness of breath, and inability to sit or stand for long periods of time limited her ability to work.[194]  At that time, Plaintiff said that a typical day involved brushing her teeth, showering, taking medication, and going to doctor appointments as needed.[195]  She stated that pain awoke her several times at night.[196]  Plaintiff claimed no problem with personal care and no need for reminders to perform tasks of personal hygiene or to take medication.[197]

Plaintiff said she was able daily to prepare frozen dinners or sandwiches for meals and was able to clean her home weekly without outside encouragement.[198]  She listed her outside activities as doctor appointments and shopping for groceries and cleaning supplies.[199]  She said she was still able to go out alone and to drive, as well as pay bills, count change, handle a savings

---

[193]   See Tr. 189.

[194]   See Tr. 192.

[195]   See Tr. 193.

[196]   See id.

[197]   See Tr. 193-94.

[198]   See Tr. 194

[199]   See Tr. 195.

account, and use a checkbook or a money order.[200]  Plaintiff noted again that she was no longer able to ride ATVs and horses as she had previously, specifically pointing out that joint pain and numbness in her arms and hands prevented these activities.[201]  Her social activity, Plaintiff reported, was limited to talking on the telephone on a daily basis.[202]

Regarding limitations, Plaintiff repeated the same activities as in her prior report except that she reported no problems with walking, hearing, seeing, and using her hands.[203]  She said she could walk fifteen yards before needing to rest for ten to fifteen minutes.[204]  Plaintiff indicated that she could pay attention for ten to fifteen minutes and that sometimes she finished what she started.[205]  She was still able to follow written and spoken instructions, she said, and was able to get along with authority figures.[206]  Plaintiff also said that stress and changes in routine continued to cause her trouble.[207]  She did not indicate that she

---

[200]   See id.

[201]   See Tr. 196.

[202]   See id.

[203]   See Tr. 197.

[204]   See id.

[205]   See id.

[206]   See Tr. 198.

[207]   See id.

was using any assistive device.[208]  According to the report, she was not experiencing side effects from her medication.[209]

Another disability report, completed in January 2012, reported that Plaintiff had experienced the following changes in her condition: numbness in both arms and left leg, migraine headaches, and anxiety.[210]  Plaintiff said that these changes occurred approximately two months prior to the completion of this third report.[211]  Although Plaintiff claimed no changes in her daily activities since the December 2011 report, she stated that she had less ability to care for herself due to "loss of function in my arms and hands periodically due to num[b]ness, migraines and chronic pain throughout my entire body."[212]

Defendant denied Plaintiff's application at the initial and reconsideration levels.[213]  Plaintiff requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.[214]  The ALJ granted Plaintiff's request and conducted a hearing on September 26, 2012, in Fort Worth, Texas.[215]

---

[208]    See id.

[209]    See Tr. 199.

[210]    See Tr. 202.

[211]    See id.

[212]    Tr. 205.

[213]    See Tr. 13, 81-82, 85-95, 431.

[214]    See Tr. 13.

[215]    See Tr. 13, 31-80, 96-99, 103-18, 121-27.

C.   <u>Hearing</u>

At the hearing, Plaintiff and a vocational expert ("VE"), Todd Hardin ("Hardin" or "VE"), testified.[216]  Plaintiff was represented by an attorney.[217]

Plaintiff's attorney began the questioning.[218]  In response to a question, Plaintiff explained that she had been on long-term disability beginning in 2011 and continuing through the date of the hearing.[219]  She said that she stopped working in December 2010 after an ATV accident in which she suffered an AC joint separation that required surgery.[220]  Plaintiff confirmed that, about a week after that surgery, she fell and broke her clavicle, an injury that required a second surgery.[221]  About a month after the second surgery, Plaintiff said, she suffered another break in the same shoulder and required a third surgery.[222]  Plaintiff stated that the third surgery included the placement of a metal plate and pins across the right shoulder.[223]  Plaintiff later underwent a fourth

---

[216]   <u>See</u> Tr. 31-80.

[217]   <u>See</u> Tr. 31.

[218]   <u>See</u> Tr. 37.

[219]   <u>See</u> <u>id.</u>

[220]   <u>See</u> Tr. 39, 47.

[221]   <u>See</u> Tr. 47.

[222]   <u>See</u> <u>id.</u>

[223]   <u>See</u> <u>id.</u>

surgery to remove the hardware.[224]

When asked by the ALJ whether she experienced any improvement after the fourth surgery, Plaintiff said that she had experienced improvement but believed that the metal plate and pins had caused nerve damage that resulted in sensations of pins and needles and numbness.[225]  She also responded that range of motion and arm usage had improved since the removal of the hardware.[226]  She reported that she could raise her arm above her head "sometimes" and that, when her arm was not numb, she could reach out to the front.[227]

Plaintiff said she experienced numbness in her legs from the knees down that varied in occurrence from every day to once a week.[228]  The numbness caused her to fall down the stairs, Plaintiff reported, resulting in a torn ligament in her left knee.[229]  At the time, she said, she no longer had insurance, and, therefore, the only treatment she used was her knee brace.[230]

In response to her attorney's questioning, Plaintiff told the ALJ that she had been diagnosed with fibromyalgia, which caused

---

[224]   See id.

[225]   See Tr. 47.

[226]   See Tr. 47-48.

[227]   See Tr. 48.

[228]   See Tr. 43.

[229]   See id.

[230]   See id.

chronic pain in her joints and muscles and depression.[231]  "I have flu-like symptoms, but it is excruciating pain . . . in my arms, in my neck and my shoulders and my back and my legs and my feet and my fingers."[232]  She said the pain in her neck registered at a seven on a pain scale of one to ten and that she experienced that pain daily.[233]  In addition to fibromyalgia, Plaintiff said that she had been diagnosed with chronic fatigue and chronic pain syndromes.[234]

Plaintiff said the she also suffered from degenerative joint disease that affected her neck and her "cervix or hip."[235] Plaintiff stated that rheumatoid arthritis and osteoarthritis affected her hands, knees, and fingers.[236]  Plaintiff reported that she suffered weekly migraine headaches that lasted anywhere from six hours to all day long, depending on whether she had access to the prescribed medication.[237]  If she did, she said, the headache would not last as long, but, if she did not, she would rest in complete darkness with no sounds.[238]  Plaintiff's last migraine

---

[231]    See Tr. 44.

[232]    Id.

[233]    See Tr. 45.

[234]    See id.

[235]    See Tr. 44.

[236]    See Tr. 44-45.

[237]    See Tr. 45-46, 63.

[238]    See Tr. 63.

lasted for twelve hours without medication, she said.[239]   Plaintiff also stated that she had been to hospital emergency rooms on several occasions for bronchitis, a knee injury, migraines, and anxiety.[240]

With regard to her mental health, Plaintiff reported that she experienced depression and anxiety.[241]   As Plaintiff explained, the depression manifested in a lack of desire to get out of bed, a lack of desire to live (without a desire to die), and persistent crying.[242]   Plaintiff said that she experienced panic attacks daily that, if she took Xanax right away, lasted as little as ten minutes.[243]   Plaintiff's attorney notified the ALJ that Plaintiff had experienced a panic attack immediately prior to the hearing and took medication that was alleviating the anxiety symptoms.[244]

Plaintiff listed all of her medications for the ALJ and asseverated that the pain medication provided only minimal relief.[245]   She said that she took hydrocodone three times per day and that, despite her complaints of the ineffectiveness of the pain

---

[239]   See id.

[240]   See Tr. 62.

[241]   See Tr. 46.

[242]   See id.

[243]   See Tr. 63-64.

[244]   See Tr. 36.

[245]   See Tr. 51.

medication, her doctors chose not to increase the dosage.[246]   She stated that Ambien did not help her sleep and that there were days that she could sleep only three hours and days that she could sleep fifteen hours.[247]

Plaintiff said that, since her insurance had been canceled, she could "barely afford" to pay her rheumatologist and to buy her medications; so, she was not seeking mental health treatment.[248] When asked whether she had inquired about free counseling, Plaintiff responded that she had not.[249]

As of the date of the hearing in September 2012, Plaintiff stated, she had lost complete feeling in the arms and fingers on her right side.[250]   She alleged that she was significantly limited in her ability to use the arm and hand on her right, dominant side.[251]   According to Plaintiff, the resulting limitations to her right upper extremity included difficulty picking up items, proclivity for dropping items, inability to lift a gallon of milk, and difficulty with fine finger manipulation.[252]   Plaintiff said that she had approximately seventy-five percent "more bad days than

---

[246]   See Tr. 51-52.

[247]   See Tr. 52.

[248]   See Tr. 53.

[249]   See id.

[250]   See Tr. 41.

[251]   See id.

[252]   See id.

good days."[253]  On bad days, she was "[b]asically" unable to get out
of bed, and tasks, such as taking care of her hair, were either not
possible or took "long periods of time to complete."[254]

Plaintiff said that her nineteen-year-old son lived with her
and helped her complete household tasks, such as washing laundry
and dishes.[255]  Plaintiff's son drove her places because, she said,
she was unable to drive due to numbness in her arms and legs.[256]
"They can go out at any time and that would just be a danger to
myself or other people on the road to drive."[257]  Plaintiff told the
ALJ that she had stopped driving in December 2011 because she was
not safe driving.[258]  The ALJ asked if something had happened to
precipitate the decision to stop driving; to which Plaintiff
answered that she had been ticketed for driving while intoxicated
and decided not to renew her license after that.[259]

Upon further questioning about her ADLs, Plaintiff said that
it had taken her three hours to get dressed for the hearing and
that "sometimes" she needed assistance, such as having her son tie

---

[253]    Tr. 42.

[254]    Id.

[255]    See Tr. 42-43.

[256]    See Tr. 43.

[257]    See id.

[258]    See Tr. 48-49.

[259]    See Tr. 49.

her shoes.[260]   She stated that she spent her time at home in bed
watching television for the majority of the day or "trying to do
laundry or dishes, which I have to take several breaks."[261]
According to Plaintiff, she paid her bills on a computer and used
Facebook "every now and then" on her telephone.[262]

    She reported that fear of falling made her paranoid about
standing and that she was afraid to walk down the stairs of her
apartment building.[263]   Plaintiff said that she fell frequently but
did not use any assistive device when standing or walking.[264]
Plaintiff said that she could not walk a block without "feeling
like I'm going to pass out because I have, I get shortness of
breath."   She said that she would become uncomfortable sitting
after fifteen to twenty minutes, and, if she stood longer than
fifteen to twenty minutes, her back would hurt so significantly
that she needed to lie down.[265]   Plaintiff said that she spent
eighty percent of her day lying down.[266]

    With regard to the use of her hands, Plaintiff said that she
was able to make herself a meal and that she could "sometimes" cut

---

[260]   See Tr. 54.

[261]   Id.; see also Tr. 61.

[262]   See Tr. 60.

[263]   See Tr. 55, 60.

[264]   See Tr. 55.

[265]   See Tr. 66.

[266]   See id.

food or eat with utensils.[267]  As long as her right hand was not numb, she said, she could sign her name; when it was numb, she had to sign left handed.

Plaintiff stated that she was experiencing increased anxiety around people over the preceding year, for example, when she went to the grocery store.[268]  She said that she and her son visited her mother in Palestine, Texas, twice a year.[269]  Other than those visits and an out-of-town trip to another son's wedding, Plaintiff had not traveled since the ATV accident.[270]  Plaintiff said she was no longer able to ride ATVs or horses like she had previously enjoyed.[271]

Upon the ALJ's questioning, Plaintiff opined that she would not be able even to perform a job where she did not have to deal with anyone and could sit or stand whenever she wanted because she needed to be able to lie down.[272]  "Like right now I'm so uncomfortable and my knees are going numb, so I know I can't stand but just this sitting in this chair is giving me chronic pain."[273]

At the conclusion of Plaintiff's testimony, Hardin took the

---

[267]   See Tr. 56, 57.

[268]   See Tr. 55-56.

[269]   See Tr. 58.

[270]   See id.

[271]   See Tr. 60.

[272]   See Tr. 65.

[273]   Id.

stand to discuss Plaintiff's past work history and the capability of an individual with Plaintiff's RFC to perform those or other jobs.[274]  Hardin stated that all of Plaintiff's past relevant work fit within the Dictionary of Occupational Titles ("DOT") definitions of either an advertising sales representative or an appointment clerk.[275]  Hardin considered the former to be at a light exertional level and the latter to be at a sedentary exertional level.[276]  The ALJ presented the following hypothetical individual:

> I'm going to ask you to consider a person [of Plaintiff's] age, education and work history with the ability to perform light work.  It's no lifting more than 10 pounds frequently or 20 pounds occasionally, standing and walking for six out of eight hours, sitting for six. We're going to place postural at occasional, stooping, kneeling, crouching, crawling.  No climbing of ladders[,] ropes or scaffolds.  We'll also put a restriction [of] no working around hazards[,] at unprotected heights or dangerous moving machinery.  Only occasional overhead reaching with the right dominant upper extremity. Frequent but not constant reaching in other directions with the right dominant upper extremity.  We'll put a restriction of only occasional public contact and can do detailed but not complex job tasks.[277]

The VE stated that such an individual could not perform any of Plaintiff's prior relevant work but would be able to perform work as a hand packager, a machine tender, and a bench assembler.[278]  The

---

[274]     See Tr. 68-79.

[275]     See Tr. 69.

[276]     See id.

[277]     Tr. 69-70.

[278]     See Tr. 70.

ALJ adjusted the hypothetical person's limitations by adding only occasional reaching in all directions with the right upper extremity, and Hardin said that such a person could not perform any of those three jobs.[279]   Hardin opined that two jobs would be available to the individual with those limitations: conveyor line bakery work and fruit distributer, both quality-control positions requiring only light exertion.[280]   If the individual was able to have frequent public contact, Hardin opined, the person also would be able to perform jobs such as counter clerk, tanning salon attendant, and rental consultant, all jobs at the light exertional level.[281]   Hardin said that those three jobs and the hand packager, machine tender, and bench assembler also could be performed by someone limited to simple job tasks.[282]

The ALJ then asked about a hypothetical individual limited to sedentary exertion, which he described as no lifting of more than five pounds frequently or ten pounds occasionally, standing and walking for two hours and sitting for six.[283]   The ALJ added the same initial restrictions with occasional overhead reaching and limited it to simple job tasks and only occasional public contact

---

[279]    See id.

[280]    See Tr. 70-71.

[281]    See Tr. 71.

[282]    See Tr. 71-72.

[283]    See Tr. 72.

and frequent telephone contact.[284]

The VE said that customer service and sales skills would be transferable to sedentary work.[285]  He stated that with the hypothetical limitations and transferable skills, such an individual could perform the jobs of order clerk, appointment clerk, and telephone marketer.[286]  If the same hypothetical individual were limited to simple job tasks, Hardin opined, that person would be capable of performing the work of a call-out operator, a document preparer, and a stuffer in the pillow or toy manufacturing industry.[287]  With the further limitation of only occasional reaching in all directions, Hardin said that only the call-out operator, which is a telephonic information verifier, would remain as a possible job.[288]  If the individual needed to lie down and recline for longer than the standard breaks, just needed longer breaks, or had unscheduled absences of more than two per month on average, that person would not be employable in Hardin's opinion.[289]

Plaintiff's attorney asked Hardin if the jobs named required bilateral use of the arms and hands; to which Hardin answered that

---

[284]    See id.

[285]    See id.

[286]    See Tr. 72-73.

[287]    See Tr. 73-74.

[288]    See Tr. 74.

[289]    See Tr. 74-75.

they did as typically performed but, in his opinion, could be performed primarily with one hand.[290]   The attorney also asked for a more detailed description of the conveyor line bakery worker position, to which Hardin explained:

> Conveyor line bakery worker performs any combination of tasks in preparing of cakes, preparation of cakes along a conveyor line.  Reads production schedules, inspects cakes moving along conveyor to detect defect [sic] and removes defective cakes from conveyor to rejection bin, positions cakes on conveyor, observes cakes moving under automatic topping shaker, notifies supervisor of malfunction.[291]

When asked, Hardin said that the position did not require bilateral use of the hands or the actual making of the cakes.[292]

Hardin also read the description of the fruit distributor position:

> Tends conveyor to distribute citrus fruit to packers' workstations.  Tends conveyor, . . . controls catwalk besides conveyor, monitors flow of fruit passing to each packing station.  Re-routes flow of fruit to maintain supply to packers, pushes or pulls on rod to move longitudinal deflector bar regulating flow of fruit to approximate . . . packing speed of each worker, turns wingnuts to clamp rod attached to deflector bar in place, repeats tasks to adjust all deflector bars necessary to obtain desired flow of fruit to packers.[293]

Hardin said that the ability to perform the job with a non-dominant hand depended on whether that individual had become highly skilled

---

[290]   See Tr. 75.

[291]   Tr. 76.

[292]   See Tr. 76-77.

[293]   See Tr. 77-78.

at doing so and could keep up with the production requirement.[294]
However, if the person was limited in using the dominant hand to
only one hour per eight-hour workday, could have no contact with
the general public and only occasional contact with other workers
and supervisors, and would be off-task twenty percent of the time,
Hardin opined that the individual would not be able to maintain
employment.[295]

## D.  **Commissioner's Decision**

On January 15, 2013, the ALJ issued an unfavorable decision.[296]
The ALJ found that Plaintiff met the requirements of insured status
through March 31, 2013, and that Plaintiff had not engaged in
substantial gainful activity from December 17, 2010, the alleged
onset date, to the date of the ALJ decision.[297]  The ALJ recognized
the following impairments as severe: "degenerative joint disease of
the right shoulder with previous surgeries and complications,
degenerative disc disease of the cervical spine, and depression."[298]
As non-severe impairments, the ALJ recognized "minimal ostoephytes
of the knees, fibromyalgia, and chronic fatigue syndrome."[299]

Plaintiff's severe impairments, individually or collectively,

---

[294]    See Tr. 78.

[295]    See Tr. 79.

[296]    See Tr. 10-26.

[297]    See Tr. 13, 15, 26.

[298]    Tr. 15.

[299]    Id.

did not meet or medically equal any Listing, according to the ALJ.[300]   In particular, the ALJ considered Listing 1.02 (major dysfunction of a joint) and Listing 1.07 (fracture of an upper extremity) in connection with Plaintiff's shoulder impairment, Listing 1.04 (disorders of the spine) in connection with Plaintiff's cervical spine/back impairment, and Listing 12.04 (affective disorders) in connection with depression.[301]

The ALJ determined from the evidence that Plaintiff did not suffer the degree of difficulty in performing fine and gross movements required to meet Listing 1.02 and did not establish that she experienced a nonunion of a fracture under continuing surgical management directed toward restoration of the extremity's functional use or that the functional use was not restored or expected to be restored within twelve months of onset.[302]   He also found no "evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis as required under [L]isting 1.04" or evidence of inability to ambulate effectively.[303]

The ALJ discussed Listing 12.04 in great detail, addressing each criteria listed in paragraph B of that Listing, which requires two of the following: marked restriction of activities of daily

---

[300]   See id.

[301]   See Tr. 16.

[302]   See id.

[303]   Id.

living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, or repeated episodes of decompensation, each of extended duration.[304] The ALJ read the evidence to show mild restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence, or pace, and no episodes of decompensation of extended duration.[305] The ALJ also considered and discussed the criteria of paragraph C, finding that the evidence failed to document the requirements.[306] Although finding that Plaintiff did not meet the requirements of Listing 12.04, he incorporated the degree of limitation found in the Listing's analysis into his RFC assessment.[307]

Fibromyalgia is not covered by a specific Listing; so, the ALJ evaluated the effect of fibromyalgia on Plaintiff's RFC under the criteria of Social Security Ruling ("SSR") 12-2P.[308] The ALJ also evaluated the medical evidence to determine if fibromyalgia was established as a medically determinable impairment and considered it in the evaluation process.[309]

In determining Plaintiff's RFC to perform work-related

---

[304] See Tr. 16-17.

[305] See id.

[306] See Tr. 17.

[307] See id.

[308] See Tr. 16.

[309] See id.

46

activities, the ALJ discussed Plaintiff's alleged symptoms and her medical treatment and stated that he followed the regulatory requirements as to both.  When considering Plaintiff's symptoms, the ALJ first evaluated whether a medically determinable impairment could reasonably be expected to produce the alleged symptoms. Second, he evaluated the "intensity persistence, and limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit[ed] the claimant's functioning," making a credibility finding for those symptoms that they were not substantiated by objective medical evidence.[310]

The ALJ engaged in a thorough account of Plaintiff's statements regarding the symptoms that she experienced as a result of her impairments.[311]  Specifically, the ALJ discussed the symptoms associated with her right shoulder injuries and surgeries, degenerative joint disease in her neck, rheumatoid arthritis and osteoarthritis in the hands, fingers, and knees, depression, and anxiety.[312]  He also addressed the symptoms that Plaintiff attributed to fibromyalgia, chronic fatigue syndrome, and chronic pain syndrome, as well as Plaintiff's representations regarding her RFC.[313]

---

[310]   Id.

[311]   See Tr. 18-20.

[312]   See Tr. 18-19.

[313]   See Tr. 19-20.

47

He concluded: "After careful consideration of the evidence, undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."[314]  In support of this conclusion, the ALJ stated that the longitudinal medical evidence reflected that Plaintiff was not as limited as she alleged.[315]  He also concluded that Plaintiff's allegations of symptoms and restrictions were only partially credible because Plaintiff's ADLs suggested "she [was] more capable than she claim[ed]."

The ALJ turned to a discussion of Plaintiff's medical treatment, including records from the December 2010 AC dislocation, surgery, and reinjury; from Dr. Basu for evaluation and treatment of joint and muscle pain related to fibromyalgia; from Dr. Bajaj for surgical followup; from Orthopedic Specialty Associates for knee pain and injections; from medical scans and tests; and from Dr. Noble for a consultative mental-health examination.[316]  The ALJ also discussed the psychiatric review technique and mental residual functional capacity completed in October 2011 and the physical

---

[314]   Tr. 20.

[315]   Id.

[316]   See Tr. 20-23.

residual functional capacity assessment completed in November 2011.[317] The ALJ discussed Dr. Basu's 2012 opinions regarding Plaintiff's RFC.[318]

The opinions of the psychological consultants (Drs. Lankford and Campa) were accorded substantial but not significant weight because, the ALJ wrote, although they were generally consistent with the evidence of record, they did not find her limitations as significant as did the ALJ.[319] The opinions of the medical consultants (Drs. Herman and Yu) were accorded moderate weight because, the ALJ explained, they too found the evidence to suggest that Plaintiff was less limited than he did.[320] Dr. Basu's opinions were accorded limited weight because, the ALJ stated, they were inconsistent with Dr. Basu's own medical assessments noted in his records.[321]

The ALJ found Plaintiff capable of performing work at the light level of exertion because she could lift and/or carry twenty pounds occasionally and ten pounds frequently and could stand and/or walk six out of eight hours and sit for six out of eight hours.[322] The ALJ included the following limitations in Plaintiff's

---

[317]   See Tr. 22-23.

[318]   See Tr. 24.

[319]   See Tr. 23.

[320]   See id.

[321]   See Tr. 24.

[322]   See Tr. 18.

RFC: (1) occasional stooping, kneeling, crouching and crawling; (2) no climbing ladders, ropes, or scaffolds; (3) occasional reaching in all directions with her right dominant arm; (4) no working around hazards, such as unprotected heights and dangerous moving machinery; (5) frequent engaging in public contact; and (6) performing detailed but not complex job tasks.[323]

The ALJ found Plaintiff unable to perform her past relevant work.[324]  The ALJ noted that, if Plaintiff had been able to perform a full range of light work, the Medical-Vocational Guidelines[325] directed a finding of not disabled.[326]  However, his RFC assessment did not find Plaintiff capable of a full range of light work; thus, the ALJ explained, he relied on the testimony of the VE to determine whether Plaintiff could perform other work.[327]  Based on the VE's response to the ALJ's hypothetical question asking whether a person with Plaintiff's age, education, work experience, and RFC could perform work available in the state and national economies, the ALJ stated that he found Plaintiff capable of performing the requirements of occupations such as a conveyor bakery worker, fruit distributor, counter clerk, tanning salon attendant, rental

---

[323]   Id.

[324]   See Tr. 24.

[325]   20 C.F.R. Pt. 404, Subpt. P, App. 2.

[326]   See Tr. 25.

[327]   See id.

50

consultant, and call out operator.[328]  The ALJ found that Plaintiff
had not been under a disability from December 17, 2010, through
January 15, 2013, the date of the ALJ's decision.

Plaintiff appealed the ALJ's decision, and, on January 29,
2014, the Appeals Council denied Plaintiff's request for review,
thereby transforming the ALJ's decision into the final decision of
the Commissioner.[329]  After receiving the Appeals Council's denial,
Plaintiff sought judicial review of the decision by this court.[330]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner
denying disability benefits is limited to the determination of
whether: 1) the ALJ applied proper legal standards in evaluating
the record; and 2) substantial evidence in the record supports the
decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the
ultimate burden of proving she is disabled within the meaning of
the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).
Under the applicable legal standard, a claimant is disabled if she
is unable "to engage in any substantial gainful activity by reason
of any medically determinable physical or mental impairment. . . .

---

[328]   See Tr. 25-26.

[329]   See Tr. 1-3, 8, 209-16.

[330]   See Tr. 1, 2-3; Doc. 1, Pl.'s Compl.

which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

## B.  Substantial Evidence

The widely accepted definition of "substantial evidence" is

"that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." <u>Carey v. Apfel</u>, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." <u>Id.</u> The Commissioner has the responsibility of deciding any conflict in the evidence. <u>Id.</u> If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g); <u>Selders v. Sullivan</u>, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999). In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless. <u>Id.</u>

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits. Plaintiff asserts that the ALJ's decision contains the following errors: (1) failure to give proper weight to the opinions of Dr. Basu; (2) failure to properly apply

53

the governing legal standards in 20 C.F.R. § 404.1527(d); (3) failure to properly evaluate Plaintiff's medical impairments; and (4) failure to properly assess Plaintiff's RFC.  Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.  The court discusses Plaintiff's arguments in order but combines the first two.

**A.    Failure to Give Proper Weight to Dr. Basu's Opinions and to Properly Apply 20 C.F.R. § 404.1527(d)**

The ALJ must evaluate every medical opinion in the record and decide what weight to give each.  See 20 C.F.R. § 404.1527(c).  Generally, the ALJ will give more weight to medical sources who treated the claimant because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations."  20 C.F.R. § 404.1527(c)(2); see also Greenspan, 38 F.3d at 237 (stating that the Fifth Circuit has "long held that 'ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment[s], and responses should be accorded considerable weight in determining disability.'")(quoting Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996)(stating that medical source opinions must be carefully considered, even on issues reserved to the

Commissioner).

The ALJ is required to give good reasons for the weight given a treating source's opinion.  20 C.F.R. § 404.1527(c)(2);  SSR 96-2p, 1996 WL 374188, at *5.

> When the determination or decision . . . is a denial[,] . . . the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record[] and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5.  The regulations require that, when a treating source's opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is to be given controlling weight.  20 C.F.R. § 404.1527(c)(2); see also Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000); SSR 96-2p, 1996 WL 374188, at *1 (July 2, 1996).  When the ALJ does not give a treating physician's opinion controlling weight, he must apply the following factors to determine the weight to give the opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination;" (2) the "[n]ature and extent of the treatment relationship;" (3) the relevant medical evidence supporting the opinion; (4) the consistency of the opinion with the remainder of the medical record; (5) the treating physician's area of specialization.  20 C.F.R. § 404.1527(c);

Newton, 209 F.3d at 456.

    Plaintiff argues that the ALJ "rejected the opinions of Dr. Basu," stating that the ALJ ignored Dr. Basu's chart notes.[331] Plaintiff is clearly mistaken in this regard.  The ALJ discussed in detail the chart notes from the December 2010 and August 14, 2012.[332]  He also discussed the series of knee injections that Dr. Basu gave Plaintiff on July 1, 2011; August 29, 2011; November 4, 2011; November 11, 2011; and November 18, 2011.  The ALJ mentioned the June 2012 appointment.   In total, the ALJ devoted the equivalent of at least one page of his fourteen-page decision to Dr. Basu's appointment notes.

    Based on this mistaken reading of the ALJ's decision, Plaintiff asserts that the ALJ should have articulated specific reasons for rejecting Dr. Basu's opinions.  Plaintiff further contends that, even if the treating physician's opinion is inconsistent with other record evidence, it should not be rejected but, rather, should be given less than controlling weight.

    To begin with, the ALJ clearly stated that Dr. Basu's opinions regarding Plaintiff's functional ability provided in the Fibromyalgia Medical Source Statement and Manipulative Limitations Medical Source Statement were accorded "limited weight," not

---

[331]    Doc. 19, Pl.'s Mot. for Summ. J. p. 7.

[332]    See Tr. 20-21, 23.

completely rejected or ignored.[333]  Secondly, the ALJ said that he did not give them controlling weight because those opinions were inconsistent with Dr. Basu's own treatment notes.[334]  The ALJ proceeded to list the portions of the notes that he found to contradict Dr. Basu's medical source statements.[335]  The ALJ found the "extreme limitations contained in Dr. Basu's opinions" to be contradicted by the Plaintiff's ADLs as well and listed examples of those contradictory activities.[336]

The ALJ's discussion of Dr. Basu's treatment notes and medical source statements complies with the requirement from the regulations, SSRs, and case law to evaluate every medical opinion in the record and decide what weight to give each.  It also complies with the requirement to give good reasons for the weight given a treating source's opinion.  The ALJ is required to consider certain factors, such as the length of the treatment relationship, in deciding what weight to give a medical source opinion; however, the ALJ is not required to record in writing every step of the process.  20 C.F.R. 404.1527(d)(2); <u>Kim Nguyen v. Colvin</u>, No. 4:13-CV-2957, 2015 WL 222328, at *10 (S.D. Tex. Jan. 15, 2015)("[W]here there is reliable medical evidence from a treating or examining

---

[333]    Tr. 24.

[334]    <u>Id.</u>

[335]    <u>See</u> <u>id.</u>

[336]    <u>Id.</u>

57

physician that controverts the claimant's physician, the detailed inquiry of each factor . . . is unnecessary."). Nevertheless, the ALJ's decision here noted Dr. Basu's area of specialty, included references to the length of the treatment relationship and the frequency, nature, and extent of Plaintiff's appointments with Dr. Basu, and specifically addressed the consistency of his medical source statement with his own treatment notes and Plaintiff's self report of her ADLs.

In a related argument, Plaintiff contends that the court is limited in evaluating whether the ALJ applied the proper legal standards to "the reasons articulated by the ALJ for discrediting Dr. Basu's opinions."[337]  Plaintiff condemns the ALJ's decision as containing "superficial analysis" that "does not even come close to the standard enunciate in the regulations and case law for examining medical source opinions."[338]

As explained above, the court finds that the ALJ provided sufficient reasons for the weight given Dr. Basu's opinions and that the court need not look anywhere else to justify the ALJ's decision.

B.  **Failure to Properly Evaluate Plaintiff's Medical Impairments**

The Social Security Administration issued SSR 12-2p to provide guidance in determining whether the evidence establishes a

---

[337]    Doc. 19, Pl.'s Mot. for Summ. J. p. 10.

[338]    Id.

medically determinable impairment of fibromyalgia and in evaluating fibromyalgia in disability claims. SSR 12-2p, 2012 WL 3104869, at *1. Fibromyalgia can provide the basis for a finding of disability. Id. at *2.

In determining whether it is a medically determinable impairment, the ALJ first looks for evidence that an acceptable medical source reviewed the individual's medical history, conducted an examination, and documented findings that are consistent with a diagnosis of fibromyalgia, that indicate how the individual's symptoms have varied in intensity over time, and that indicate the physician assessed the individual's physical strength and functional abilities over time. See id. The ALJ must also consider the following specific criteria: a history of widespread pain, at least eleven positive tender points, and the exclusion of other disorders that could cause the individual's symptoms.[339]

When evaluating subjective testimony regarding fibromyalgia symptoms and functional limitations, the ALJ employs the same process as used for any medically determinable impairment. See SSR 12-2p, 2012 WL 3104869, at *5. The regulations explain that, when the medical evidence reveals a medically determinable impairment that could produce pain or other symptoms, the analysis is to focus

---

[339] An alternative series of specific criteria is provided in the SSR. The only difference is the substitution of a finding of "[r]epeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions" in place of a finding of eleven tender points. See SSR 12-2p, 2012 WL 3104869, at *2.

on the intensity, persistence, and limiting effects of the complained-of symptom to determine how it limits the claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1); SSR 12-2p, 2012 WL 3104869, at *5; see also SSR 96-7p, 1996 WL 374186, at **1-2 (July 2, 1996)(clarifying 20 C.F.R. § 404.1529(c)).  In order to evaluate the intensity, persistence, and limiting effects of the pain or other symptoms, the ALJ considers all available evidence, including medical history, medical signs and laboratory findings, the statements of treating providers, and the subjective testimony of the claimant. 20 C.F.R. § 404.1529(c); see also SSR 96-7p, 1996 WL 374186, at **1-2 (July 2, 1996).

Here, Plaintiff complains that, although the ALJ set out the factors he considered in evaluating fibromyalgia, he "never went on to explain how he evaluated Plaintiff's condition under SSR 12-2p."[340]  Plaintiff also complains that the ALJ failed to "make any comment on Plaintiff's testimony or come to any substantive conclusions regarding Plaintiff's fibromyalgia."

The court starts by noting that SSR 12-2p does not require the ALJ to explain in writing the details of how he evaluated Plaintiff's condition. See SSR 12-2p, 2012 WL 3104869, at **2-3. It is enough that the ALJ set out the criteria for determining whether fibromyalgia is a medically determinable impairment and stated that he considered the evidence in light of that criteria.

---

[340]     Doc. 19, Pl.'s Mot. for Summ. J. p. 12.

The ALJ said he made the consideration, and Plaintiff offers no reason for the court to doubt his statement.

More salient, though, is the fact that the ALJ did recognize fibromyalgia as a medically determinable impairment pursuant to the criteria of SSR 12-2p.[341]   He found fibromyalgia to be a medically determinable impairment, but he found it to be nonsevere.   In explaining that finding, the ALJ stated that he found the "longitudinal evidence of record" to reflect that it was not more than a slight abnormality with minimal effect on Plaintiff such as not to interfere with her ability to work.[342]   The ALJ used the proper standard at step two of the process to find that fibromyalgia was not severe.   The evidence supports that finding. The record indicates that Plaintiff suffered from fibromyalgia for years prior to the alleged onset date during which time she worked full time.   Her pain waxed and waned, getting slightly better and remaining stable at times.   Also, Plaintiff's ADLs after she quit working, which the ALJ discussed later in the decision, also support a finding that she was not as limited by the fibromyalgic pain as she argues in her brief.

Plaintiff's argument that the ALJ failed to make any comment on Plaintiff's testimony or to reach any substantive conclusions

---

[341]    See Tr. 15 ("[T]he claimant also has the non-severe impairment[] of . . . fibromyalgia"); Tr. 16 ("The claimant's impairment of fibromyalgia . . . .") ("[T]he undersigned considered the claimant's fibromyalgia impairment under the five-step sequential evaluation process.").

[342]    Tr. 15.

about the fibromyalgia diagnosis is meritless. The ALJ specifically included the portion of the hearing that Plaintiff cites in her brief, seemingly to indicate what testimony the ALJ did not discuss.[343] The ALJ evaluated fibromyalgia at step two and step three, explaining why he did not find it to be a severe impairment, the process he used to evaluate it, and his decision to include its effects in Plaintiff's RFC. At step five, the ALJ said that he found Plaintiff's medically determinable impairments to be expected to cause the alleged symptoms but found her statements on intensity, persistence, and limiting effects not to be entirely credible. The ALJ continued by discussing Plaintiff's medical treatment by Dr. Basu and others and the medical opinions of the treating, examining, and consulting physicians in support of the ALJ's finding that Plaintiff was not as limited as she alleged.[344]

The court finds that the ALJ's decision regarding fibromyalgia does comply with the applicable legal standards and is supported by substantial evidence.

## C.  <u>Failure to Properly Assess Plaintiff's RFC</u>

In reaching a decision on RFC, the ALJ is required to perform a function-by-function assessment of "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." <u>Myers v. Apfel</u>, 238

---

[343]    <u>Compare</u> Doc. 19, Pl.'s Mot. for Summ. J. pp. 12-13 <u>with</u> Tr. 19.

[344]    <u>See</u> Doc. 19, Pl.'s Mot. for Summ. J. pp. 20-24.

F.3d 617, 620 (5th Cir. 2001)(quoting Soc. Sec. Ruling 96-8p, 1996
WL 374184, at *1, *7 (S.S.A. 1996)).  The regulations provide that,
although the opinion of a treating physician regarding a claimant's
RFC must be considered, the ultimate responsibility for determining
this issue lies with the ALJ.  20 C.F.R. § 404.1527(d)(2); <u>Taylor
v. Astrue</u>, 706 F.3d 600, 602-03 (5th Cir. 2012).

The ALJ may properly rely on the testimony of a VE in
determining restrictions on capability to work if the hypothetical
question presented to the VE incorporates reasonably all
disabilities recognized by the ALJ, and the claimant is afforded
the opportunity to correct deficiencies in the ALJ's question.
<u>Boyd v. Apfel</u>, 239 F.3d 698, 706-07 (5th Cir. 2001); <u>Bowling</u>, 36
F.3d at 436.  The hypothetical question must take "into account all
the restrictions reasonably warranted by the evidence." <u>Dominque
v. Barnhart</u>, 388 F.3d 462, 463 (5th Cir. 2004).  If the hypothetical
question meets the above criteria, then the ALJ may justifiably
rely on the VE's testimony in deciding job availability for a
person with the plaintiff's limitations.  <u>Masterson v. Barnhart</u>,
309 F.3d 267, 273-74 (5th Cir. 2002).

Plaintiff contends that the ALJ failed to incorporate
limitations that he acknowledged elsewhere in his opinion into the
RFC determination.  Particularly, Plaintiff complains that the ALJ
said he found Plaintiff more limited than did Drs. Herman and Yu,
but did not incorporate any additional limitations in the RFC

63

assessment.  Plaintiff also points to her hearing testimony about the use of her right arm and hand and to Dr. Basu's Manipulative Medical Source Statement, arguing that she would not be able to perform the jobs cited by the VE.

Addressing first Plaintiff's concern that the ALJ failed to assess Plaintiff a more limited RFC than Drs. Herman and Yu, the court finds Plaintiff to be incorrect.  The ALJ stated that he agreed with Drs. Herman and Yu that Plaintiff was capable of light work and, thus, incorporated that in the RFC assessment. Apparently, he also agreed that Plaintiff was limited to occasional reaching with her dominant upper extremity because he included that as well.  However, he also found that Plaintiff had several postural and environmental limitations not recognized by Drs. Herman and Yu.  The ALJ's RFC assessment was, in fact, more limited than that of Drs. Herman and Yu and incorporated all limitations he acknowledged throughout his decision.

With regard to Plaintiff's second specific issue with the ALJ's RFC assessment concerning the use of hands and arms, the court refers Plaintiff to the ALJ's decision, in which he discussed both Plaintiff's hearing testimony about the use of her right arm and hand and Dr. Basu's medical source statements.  The ALJ accorded both limited weight because he found them inconsistent with the record evidence and Plaintiff's ADLs.

At the hearing, the ALJ explored a series of hypothetical

RFCs, including ones with light or sedentary exertion levels, occasional overhead reaching with the right dominant upper extremity and frequent reaching in other directions with that arm or only occasional reaching in all directions with the dominant arm, and frequent or occasional public contact. Plaintiff's attorney explored which of the jobs cited required bilateral use of the upper dominant extremity.

The jobs that the ALJ found Plaintiff capable of performing (conveyor line bakery worker, fruit distributor, counter clerk, call out operator, rental consultant, and tanning salon attendant) were determined by the VE to be either consistent with the RFC assessment in the ALJ's decision or suitable for an even more limited hypothetical individual. That said, Plaintiff's issue is less about whether the jobs were consistent with the ALJ's RFC assessment and more about the job descriptions themselves.

Plaintiff attacks at each one. For the conveyor line bakery worker, the fruit distributor, the counter clerk, and call out operator, Plaintiff argues that they require bilateral use of the upper extremities. Assumed in this argument is that Plaintiff has no use of her dominant upper extremity,[345] but that was not the ALJ's finding. The ALJ found her capable of occasional reaching in all directions with her dominant upper extremity. Including that

---

[345] Plaintiff's attorney asked the VE whether the fruit distributor position could be performed with the non-dominant hand. The answer was that it depended on the person's ability with the non-dominant hand. The evidence does not support a finding that Plaintiff could only use her non-dominant hand.

limitation, the VE found the hypothetical individual capable of those three jobs.[346]   The ALJ is entitled to rely on the VE's responses to the hypothetical questions because they incorporated all of the limitations recognized by the ALJ and supported by the record.   See Dominque, 388 F.3d at 463; Boyd, 239 F.3d at 706-07; Bowling, 36 F.3d at 436.

Plaintiff argues that the DOT contains more than one "rental clerk" position; thus, the VE's testimony is vague.[347]   Plaintiff also contends that the tanning salon attendant is not in the DOT at all.   These are non-issues because the VE is an expert on work skills and occupations and is not limited to jobs described in the DOT.   See 20 C.F.R. § 404.1566.

The ALJ's determination of Plaintiff's RFC was based on a thorough analysis of objective medical evidence found in the record and the testimony given at the hearing.   The ALJ employed proper legal standards in reviewing the evidence, and his decision in this regard is supported by substantial evidence.

## IV.  Conclusion

---

[346]   The court acknowledges Plaintiff's argument that the conveyor line bakery worker job description includes, according to the VE, "preparation of cakes along a conveyor line."  Tr. 77.  Plaintiff is being obtuse in insisting that the meaning of that task is that the person must be involved in making the cakes.  The VE answered "no" when the Plaintiff's attorney asked that question. As the job is in the area of quality control on a production line, it seems obvious that the job entails preparing the already made cakes for production, not actually making them on the conveyor.

[347]   Defendant submitted the DOT description of furniture-rental consultant, which is performed at the light level and otherwise complies with the ALJ's RFC.  See Doc. 20-2, Ex. 2 to Def.'s Resp. to Pl.'s Mot. for Summ. J., DOT Furniture-Rental Consultant Job Description.

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 30th day of September, 2015.

U.S. MAGISTRATE JUDGE